In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-3486

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARTELL D. FORD,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:18-CR-00182-JPS-3 — **J.P. Stadtmueller**, *Judge*.

———————————

SUBMITTED OCTOBER 29, 2020[*] — DECIDED FEBRUARY 22, 2021

———————————

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Defendant Martell Ford pleaded guilty to armed robbery of a taxi driver, brandishing a firearm in furtherance of that crime of violence, and attempted armed

———————————

[*] We granted the parties' joint motion to waive oral argument for this case, agreeing that this appeal could be resolved on the briefs and record and that oral argument would not significantly aid the decisional process. Fed. R. App. P. 34(f).

robbery of a gas station. He was sentenced to 114 months in prison. He challenges his below-guideline sentence, arguing that the district court made a guideline error by imposing a six-level enhancement under U.S.S.G. § 2B3.1(b)(2)(B) to the gas station attempt because his co-defendant, Marquel Johnson, "otherwise used" a firearm. We affirm.

I.  *Factual and Procedural Background*

Over the course of three days in August 2018, defendant Martell Ford, Marquel Johnson, and Nickie Foster committed a string of armed robberies in Milwaukee, Wisconsin, in different combinations. On the night of August 22, Ford and Foster robbed a taxi driver at gunpoint. While Johnson and Ford waited in a getaway car, Foster entered the backseat of the taxi, produced a silver handgun, threatened to shoot the driver if he turned around, and demanded money. Johnson, who had provided Foster with the silver handgun, then told Ford to check on her. Ford got in the front seat of the taxi as the driver was handing his money to Foster. Ford searched the driver for additional valuables. Foster then struck the driver in the head with the handgun and told Ford to hit him too. Ford complied. He punched the driver in the face. Foster and Ford got out of the taxi with the driver's cash and cellphone. They returned to the getaway car and fled with Johnson, agreeing to split the proceeds from the robbery.

The following evening, August 23, officers located the trio's getaway car with all its windows broken out, approximately one mile from a Petro Mart where Johnson and Foster had committed an armed robbery earlier that morning. A search of the car yielded several incriminating items: (i) driver's licenses of three taxi driver victims of robberies, including the driver whom Ford helped rob the night before; (ii)

a pair of blue Nike flip-flops consistent with those worn by Foster during the Petro Mart robbery; and (iii) documents and objects belonging to Johnson, including two identification cards and a prescription inhaler.

The next night, around 3:30 a.m. on August 25, Johnson and Ford parked a new getaway car on the street near the entrance to a B.P. convenience store and gas station. Surveillance cameras recorded their actions inside and outside the station.

At approximately 3:43 a.m., Johnson and Ford exited their getaway car—Ford clutching coins in his fist—and entered the store. Once inside, Ford thrust the coins into Johnson's hands and retreated to the front door, propping it open. Johnson made her way to the cashier, who stood behind a sheet of ballistic-proof glass. Johnson shoved the coins toward the cashier, pointed the silver handgun at him, and ordered him to hand over cash. The cashier refused. Ford, still at the front door, peered outside, opened the door, and then exited the store. As the front door closed, the quick-thinking cashier activated the door lock. That prevented Johnson from exiting the store and also prevented Ford from re-entering.

Ford, unaware that the door was now locked, tried to open the door for Johnson. When he could not, he returned to the getaway car and fled. Johnson, stuck inside, continued to threaten the cashier while trying to open the door. She eventually managed to escape by another exit. When Johnson later met up with Ford, she yelled at him for abandoning her in the store.

Later on August 25, Johnson was arrested after she crashed the new getaway car during a high-speed chase. Officers recovered a loaded silver .22 caliber handgun from her pocket,

with distinctive characteristics (a duct-taped handle) match-ing those of the silver handgun seen in surveillance camera recordings featuring Johnson, Foster, and Ford.

Ford was arrested some days later, on September 7, 2018. He admitted that he was present during the attempted rob-bery of the B.P. station. He claimed that the plan was only to exchange coins for dollar bills. He said that once inside the store, he handed coins to Johnson, who asked the cashier to exchange them for dollar bills. However, once the cashier opened the register, Johnson pointed her handgun at the cash-ier and attempted to rob him.

A year later, Ford pleaded guilty to two counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and one count of brandishing a firearm to further a crime of violence in vio-lation of 18 U.S.C. § 924(c)(1)(A)(ii). One Hobbs Act robbery and the § 924(c) charge were based on the taxi robbery on Au-gust 22. The other Hobbs Act robbery count was for the at-tempted armed robbery of the B.P station on August 25. The court sentenced Ford to 114 months in prison, adopting the government's recommended sentence, which reflected a 35 percent downward departure from the low end of the guide-line range for the two Hobbs Act counts. The 114-month sen-tence consisted of concurrent 30-month sentences for the two robbery counts and a mandatory minimum consecutive sen-tence of 84 months for brandishing a firearm to further a crime of violence.

II. *Discussion*

On appeal, Ford claims that the district court erred in ap-plying a six-level enhancement to the attempted robbery of the B.P. station because Johnson "otherwise used" a firearm.

U.S.S.G. § 2B3.1(b)(2)(B). The Guidelines define "otherwise used" as "conduct [that] did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm." U.S.S.G. § 1B1.1, cmt. n.1(J). Ford argues that he should not have been deemed responsible for Johnson's "other use" of the firearm because her use was not, as required by U.S.S.G. § 1B1.3(a)(1)(B), within the scope of Ford's jointly undertaken criminal activity, in furtherance of it, and reasonably foreseeable to him.

Ford's sentencing memorandum downplayed his role in the attempted robbery, but he conceded that he aided and abetted the attempted robbery, at least by trying to open the door for Johnson to leave. He argues, however, that "an agreement to rob a gas station is not the same as an agreement to rob a gas station cashier at gunpoint." That may be, but the district court did not err by inferring that Ford was accountable for Johnson's use of the firearm. We reiterate that federal courts of appeals are not sentencing courts. Sentencing in the federal system is the duty of the district courts, first and foremost. On appeal, we do not determine what sentence we would have imposed. We determine whether the district court complied with the procedural requirements of sentencing and whether the court abused its discretion substantively in choosing the sentence.

We start our analysis here by asking whether the guideline enhancement actually affected the defendant's ultimate sentence. After all, the district court imposed only 30 months for each of the two armed robberies, both the taxi robbery, which did not include the six-level "otherwise-used" enhancement, and the attempted B.P. robbery, which did. (The taxi robbery did not include the enhancement because of the separate

§ 924(c) conviction, which accounted for 84 months of the to-
tal 114-month sentence. The Guidelines bar using a firearm
enhancement for a robbery that is the subject of a separate
§ 924(c) conviction. U.S.S.G. § 2K2.4, cmt. n.4.) The ultimate
sentence was a downward departure recommended by the
government. Nevertheless, the district judge did not indicate
clearly that the six-level enhancement for the B.P. attempted
robbery did not affect the ultimate sentence. Cf. *Molina-Mar-
tinez v. United States*, 136 S. Ct. 1338, 1345 (2016) ("When a de-
fendant is sentenced under an incorrect Guidelines range—
whether or not the defendant's ultimate sentence falls within
the correct range—the error itself can, and most often will, be
sufficient to show a reasonable probability of a different out-
come absent the error."); *United States v. Marks*, 864 F.3d 575,
582 (7th Cir. 2017) (remanding based on arcane guideline er-
ror where district judge did not make clear that sentence did
not depend on that guideline issue). We must therefore decide
whether the evidence and findings supported the enhance-
ment.

The district court's finding on the six-level "otherwise-
used" enhancement was terse. At sentencing the judge em-
phasized the overall seriousness of the armed robberies and
the dangers they posed to the victims, the robbers, and the
police:

> [Y]ou ought to consider yourself very, very for-
> tunate even to be alive and seated in this court-
> room today because every one of these heinous
> crimes more often than not involves chases, get-
> aways, shots being fired and victims losing
> lives, and sometimes perpetrators as well as po-
> lice officers lose their lives because when guns

> are around, they're meant to be used. And to
> suggest that one did not know or appreciate that
> a gun might be used in a robbery is utter, utter
> folly, particularly against the backdrop of the
> totality of the facts that are laid out in the
> presentence report.

The last sentence of that passage about "utter folly" was the court's clearest rejection of Ford's arguments against the six-level "otherwise-used" enhancement. We think the court's reference to the "backdrop of the totality of the facts that are laid out in the presentence report" was sufficient, particularly in light of the evidence of Ford's knowledge of the use of firearms in the series of robberies and the details of the attempted B.P. robbery.

Surveillance footage showed, for example, that Johnson and Ford opted to park on the street rather than inside the nearly empty B.P. station lot. Johnson and Ford remained in the car for several minutes before entering the convenience store, apparently waiting for the station's only customer to enter and leave the store. The video recordings further showed that once Johnson produced the silver handgun and began to rob the cashier, Ford did not appear surprised. Rather, he stood by the door—apparently as a lookout—until he realized that Johnson was unlikely to get any money from the cashier.

The government also stressed Ford's participation in the whole string of armed robberies that led up to the B.P. station attempted robbery. Significantly, although it was Ford and Foster, not Johnson, who robbed the taxi driver on August 22 at gunpoint, Ford knew that Foster was using Johnson's silver handgun and that Foster was going to use the handgun to

"bust a move" in the taxi. Taken together, the string of armed robberies and Ford's actions at the B.P. station permitted a reasonable inference that Ford knew that Johnson planned to rob the B.P. station and knew or could easily foresee that Johnson would use her handgun.

The judge did not err by treating as "utter folly" Ford's claim that he only belatedly agreed to the attempted robbery without having agreed to or foreseen her use of the firearm. And even if the district judge or we credited Ford's claim that he did not agree to participate in the attempted robbery until after Johnson pointed her firearm at the cashier, Ford knew at that moment she was using it to commit a robbery. He continued to assist her.

Ford argues that the district court could not apply the enhancement without finding that Johnson's "specific act" of pointing the firearm at the cashier's head was within the "scope" of their agreement. Adopting the facts in the revised presentence report without more specific findings concerning relevant conduct, Ford argues, was not enough. The district court's conclusion, terse as it was, that Johnson "otherwise used" the firearm in a way that was within the scope of their jointly undertaken criminal activity, in furtherance of it, and reasonably foreseeable to Ford, was well supported by both the attempted armed robbery and the trio's six armed robberies that preceded it.

Ford also argues that the district court's statement, quoted above, amounts to an impermissible assumption that since robberies "more often than not" involve "shots being fired," Ford should have foreseen Johnson's use of a firearm. We do not read the district court's comments that way. The judge was emphasizing the overall risks of death or injury in armed

robberies, without trying to quantify those risks. He was trying to show Ford the dangers of his crimes to himself and others. We do not read these oral comments as showing that the judge based the sentence on a mathematical assessment of the degree of risk. Cf. *United States v. Atwater*, 272 F.3d 511, 512–14 (7th Cir. 2001) (reversing application of enhancement where district court failed to make specific findings based on defendant's case and concluded that use of firearm in robbery was reasonably foreseeable solely because judge had "never heard of a bank robbery without a firearm"). Rather, the enhancement was based on ample evidence that Ford was in on Johnson's plan to rob the B.P. station from the start and that he continued to help after she brandished the firearm. The judge could reasonably infer that Ford had reason to know that Johnson would use a firearm in the attempt.

The judgment of the district court is

AFFIRMED.